IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCHES OF: | |
| | |
| Cell Phone 1:  Black iPhone in black case stored in FBI Pittsburgh evidence under Item 1B203 for FBI Case #245C-PG-3797188 | Mag. Nos. 24-1576 through 24-1587 |
| | |
| Cell Phone 2:  Black iPhone with no case stored in FBI Pittsburgh evidence under Item 1B204 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 3:  Grey iPhone with no case stored in FBI Pittsburgh evidence under Item 1B205 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 4:  Black iPhone with a black case stored in FBI Pittsburgh evidence under Item 1B135 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 5:  Black iPhone with no case stored in FBI Pittsburgh evidence under Item 1B151 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 6:  Blue Motorola cell phone in black case stored in FBI Pittsburgh evidence under Item 1B152 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 7:  Pink iPhone with cracked screen stored in FBI Pittsburgh evidence under Item 1B55 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 8:  Pink iPhone with cracked screen and back stored in FBI Pittsburgh evidence under Item 1B93 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 9:  Blue iPhone stored in FBI Pittsburgh evidence under Item 1B54 for FBI Case #245C-PG-3797188 | |
| | |
| Cell Phone 10: iPhone with blue and grey case stored in FBI Pittsburgh evidence under Item 1B212 for FBI Case #245C-PG-3797188 | |

Cell Phone 11: iPhone stored in FBI Pittsburgh evidence under Item 1B213 for FBI Case #245C-PG-3797188

Cell Phone 12: Dark grey iPhone stored in FBI Pittsburgh evidence under Item 1B215 for FBI Case #245C-PG-3797188

## AFFIDAVIT/APPLICATION FOR SEARCH WARRANTS

I, Ryan J. Chrobak, being duly sworn, state as follows:

### AFFIANT TRAINING AND EXPERIENCE

I am an agent with the Federal Bureau of Investigation.  I have been an agent with the FBI since 2016.  As part of my duties, I investigate criminal violations of, among other things, controlled-substance laws, including violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and firearm laws, including violations of 18 U.S.C. §§ 922(g)(1) and 924(c).

I have been directly involved in many narcotics and firearms-related arrests and the service of many narcotics and firearms-related search warrants.  I have participated in handling cooperating sources of information who were involved in narcotics acquisition and/or trafficking.  In addition, I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations.  I have had many conversations with drug traffickers and users, as well as with other law enforcement officers, about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.  As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

### SUBJECT CELL PHONES

I am currently participating in the investigation of a Drug Trafficking Organization (referred to as "the Organization" or "the DTO") that operated in New Castle/Lawrence County in Western Pennsylvania as well as in Detroit/Michigan and Youngstown/Ohio. As further established below, there is probable cause to conclude that Christian FRIERSON, Devail ADAMS, Roy BROWN, Alexis DONNELL, Kiara JONES, and George WYATT participated in the DTO and were engaged in the distribution of narcotics while using multiple cell phones, in violation of 21 U.S.C. §§ 841, 843, and 846.

This affidavit/application is submitted for search warrants for the following cell phones, referred to collectively as the **SUBJECT CELL PHONES**.  As detailed below, the **SUBJECT CELL PHONES** were seized as a result of individual arrests across the Western District of Pennsylvania, the Eastern District of Michigan, the District of Nebraska, and the District of South Carolina.  The **SUBJECT CELL PHONES** were then secured in law enforcement custody and are now stored in FBI Pittsburgh evidence, in this district, under FBI Case #245C-PG-3797188  There is probable cause to conclude that the **SUBJET CELL PHONES** contain evidence of drug-trafficking crimes, including violations of 21 U.S.C. §§ 841, 843, and 846:

**(1)     Cell Phone 1: Black iPhone in black case stored in FBI Pittsburgh evidence under Item 1B203 for FBI Case #245C-PG-3797188,**

**(2)     Cell Phone 2: Black iPhone with no case stored in FBI Pittsburgh evidence under Item 1B204 for FBI Case #245C-PG-3797188,**

**(3)     Cell Phone 3: Grey iPhone with no case stored in FBI Pittsburgh evidence under Item 1B205 for FBI Case #245C-PG-3797188,**

**(4)     Cell Phone 4: Black iPhone with a black case stored in FBI Pittsburgh evidence under Item 1B135 for FBI Case #245C-PG-3797188,**

(5)      **Cell Phone 5: Black iPhone with no case stored in FBI Pittsburgh evidence under Item 1B151 for FBI Case #245C-PG-3797188,**

(6)      **Cell Phone 6: Blue Motorola cell phone in black case stored in FBI Pittsburgh evidence under Item 1B152 for FBI Case #245C-PG-3797188,**

(7)      **Cell Phone 7: Pink iPhone with cracked screen stored in FBI Pittsburgh evidence under Item 1B55 for FBI Case #245C-PG-3797188,**

(8)      **Cell Phone 8: Pink iPhone with cracked screen and back stored in FBI Pittsburgh evidence under Item 1B93 for FBI Case #245C-PG-3797188,**

(9)      **Cell Phone 9: Blue iPhone stored in FBI Pittsburgh evidence under Item 1B54 for FBI Case #245C-PG-3797188,**

(10)      **Cell Phone 10: iPhone with blue and grey case stored in FBI Pittsburgh evidence under Item 1B212 for FBI Case #245C-PG-3797188,**

(11)      **Cell Phone 11: iPhone stored in FBI Pittsburgh evidence under Item 1B213 for FBI Case #245C-PG-3797188,**

(12)      **Cell Phone 12: Dark grey iPhone stored in FBI Pittsburgh evidence under Item 1B215 for FBI Case #245C-PG-3797188.**

I have personally participated in the investigation detailed herein. In addition, I have discussed the investigation with, and/or reviewed the reports of, other officers who have been involved in this investigation. This affidavit is being submitted for the specific purpose stated herein. I have not, therefore, included every fact known to me concerning the investigation.

## EVIDENCE COMMONLY LOCATED ON CELL PHONES

I am aware, based upon my training and experience, that the cell phone is a primary tool of the drug trade. Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business. Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cell phones. The data on current or past cell phones can be

particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.

Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

I am also aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices.  I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences.  When they are taken or retained by drug traffickers, such photographs can be evidence, or can

lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

It is now not uncommon for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds. Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.

In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Simultaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are often automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends

less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

Based on my training and experience, I am aware that each of the following parts of a cell phone is likely to contain evidence of the crimes referenced herein.  Such evidence can extend beyond evidence that directly establishes what crime was committed and by whom to evidence that establishes who used the cell phone and/or when and/or from where. Such cell-phone attribution evidence is particularly important because it links the user of the subject cell phone to the substantive evidence on the subject cell phone; it can link other users of other cell phones to the substantive evidence on the subject cell phone; and it can link the user of the subject cell phone to the location where the subject cell phone was found or where the subject cell phone was previously located based on location information stored on the cell phone.  Moreover, parts of a cell phone that demonstrate the use of the cell phone to perform functions beyond communicating and recording photos/videos, such as to search the Internet or find addresses/directions, can be important to an investigation of the crimes referenced herein because cell phones are frequently used to prepare for crimes (e.g., to shop for tools of the particular criminal trade) and to complete individual criminal acts (e.g., travel to/from the location of the particular crime).

(1)   incoming and outgoing call and text message logs

(2)   contact lists

(3)   photo and video galleries

(4)   sent and received text messages

(5)   online searches and sites viewed via the internet

(6)     online or electronic communications sent and received, including email, chat, and instant messages

(7)     sent and received audio files

(8)     navigation, mapping, and GPS files

(9)     telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone

(10)    call forwarding information

(11)    messages drafted but not sent

(12)    voice messages

## PROBABLE CAUSE

### A.     The Drug Trafficking Investigation and the Indictment

As noted above, search warrants are being sought with this affidavit/application as part of an investigation of drug trafficking in Lawrence County (Pennsylvania) and beyond. Many of the subjects of the investigation are part of a close-knit crew who are connected through family and friendship and have been convicted of felony crimes in the past.  The investigation has revealed that members of the DTO were involved in acquiring kilograms of fentanyl/heroin and cocaine/crack, as well as other controlled substances such as oxycodone, from interstate sources of supply. The investigation has further revealed that members of the DTO were serving as significant sources of supply for other drug dealers throughout Lawrence County and beyond.

On May 8, 2024, June 7, 2024, and July 3, 2024, orders were issued in the WD/PA authorizing the interception of communications over cell phones used by Devail ADAMS

(TT1 and TT4), Christian FRIERSON (TT2 and TT3), Dedric HIGGINBOTHAM (TT5), and George WYATT (TT6).  Communications were thereafter intercepted on a daily basis through August 1, 2024.   It should be noted that the interpretations of communications/evidence discussed herein are based on the results of the investigation so far, my training and experience, and the training and experience of other law enforcement officers who are involved in the investigation.

The investigation resulted in the return of a federal indictment in this district in July 2024. The indictment charges conspiracy to distribute at least 400 grams of fentanyl, 5 kilograms of cocaine, 100 grams of heroin, and a quantity of oxycodone, from August 2023 to July 2024.  The indictment charges each of the following defendants with committing that crime: CHRISTIAN FRIERSON, DEVAIL ADAMS, CHRISTOPHER BARTON, PATRICK BROWN, ROY BROWN, FRANK CHRISTIAN, TYRONE DAVIS, EDWARD DIETRICH, ALEXIS DONNELL, DEDRIC HIGGINBOTHAM, KIARA JONES, QUINTEN JONES, KENNETH KING, JERMAINE LETT, MARCUS MASON, DANIEL RASNICK, KENDRA SAGER, JAUAN SEARCY, and GEORGE WYATT.

Federal arrest warrants were then issued for each of the defendants. On August 1, 2024, law enforcement officers served the arrest warrants, resulting in the arrest of FRIERSON, ADAMS, Roy BROWN, DONNELL, Kiara JONES, and WYATT, among others.  On that same date, multiple search warrants were served in the Western District of Pennsylvania, the Eastern District of Michigan, and the Northern District of Ohio. Hundreds of items of evidence were located and seized at that time, including large quantities of suspected narcotics, firearms, U.S. currency, and cellular telephones.

B.      Recidivism

Several of the members of the DTO continued to engage in large-scale narcotics trafficking despite significant prior convictions and prison sentences.  A summary of the criminal records of some of the members of the DTO follows:

* Devail ADAMS: ADAMS has an extensive criminal record that extends beyond the past 30 years. For example, in 1989, ADAMS was convicted in Michigan for receiving stolen property and drug trafficking. In that same year, ADAMS was convicted in Michigan for committing firearms offenses and assault with intent to do bodily harm. In 1990, ADAMS was convicted in Michigan for escape from jail through violence. In 2002, he was convicted in Michigan for drug possession. In 2005, he was convicted in Michigan for assaulting/resisting/obstructing a police officer. In 2009, ADAMS was convicted in Michigan for drug trafficking. In 2012, he was once again convicted in Michigan for drug trafficking.  In 2022, he was once again convicted in Michigan for drug trafficking. Also in 2022, ADAMS was convicted in Ohio for drug trafficking.

* Christian FRIERSON: FRIERSON, who is the son of Devail ADAMS, has multiple criminal convictions during the last 15 years. In 2010, FRIERSON was convicted in Michigan for drug trafficking.  In 2012, he was once again convicted in Michigan for drug trafficking.  At that time he was also convicted in Michigan of bringing contraband into prison.

* George WYATT: WYATT has several criminal convictions during the last 30+ years. For example, in 1992, he was convicted in Michigan for sexual assault, assault with a weapon, and weapon possession crimes. In 2003, WYATT was

convicted in Michigan for domestic violence. In 2015, he was convicted in Pennsylvania for drug trafficking. In 2019, he was convicted in Michigan for weapons crimes.

**C.     Seizure of Cell Phones 10-12 on March 20, 2024**

As of March 2024, case agents were periodically receiving, via a judicial warrant, GPS/E911 location data for a cell phone that Christian FRIERSON had been using for at least several months as of that time.  On March 11, 2024, the phone location data showed that FRIERSON departed the area of New Castle, PA, shortly after 6:28 PM EST. FRIERSON travelled directly to Detroit, MI, with no obvious stops or deviations in travel, ultimately arriving around 10:38 PM. On March 12, at approximately 7:58 PM EST, phone location data confirmed that the phone was in the vicinity of the Detroit Metropolitan Wayne County Airport (DTW). Within a couple hours of its arrival at the Detroit Airport, the phone location data stopped reporting indicating that the user of the phone, FRIERSON, had boarded a flight and initiated travel. The phone location data next reported at approximately 11:18 PM PST and was now locating in the area of the Los Angeles International Airport (LAX).

The phone location data confirmed that FRIERSON remained in the greater Los Angeles area for roughly six days. This type of travel was not abnormal for FRIERSON as the investigation revealed that FRIERSON has travelled from DTW to LAX on multiple occasions. For instance, phone location data and/or subpoenaed flight information confirmed that FRIERSON travelled to and from Los Angeles on the following dates:

| **Departure Flight** | **Return Flight** | **# of Days** |
|---|---|---|
| Jan 8, 2024 (DTW to LAX) | Jan 10, 2024 (LAX to DTW) | 2 |

| Jan 23, 2024 (DTW to LAX) | Jan 26, 2024 (LAX to DTW) | 3 |
|---|---|---|
| Mar 13, 2024 (DTW to LAX) | N/A | 6 |

FRIERSON remained in Los Angeles and during the evening of March 16 relocated to an area immediately adjacent to LAX and in the vicinity of a number of hotels. FRIERSON continued to locate in that area until the early afternoon of March 19 when FRIERSON initiated travel away from Los Angeles. Based on the reporting frequency of the GPS/E911 location data, it was clear to case agents that FRIERSON was not returning via flight and was likely operating a vehicle as he began to travel east across the United States.

On March 20, at approximately 10:18 PM CST, a deputy with the Douglas County Sheriff's Office (DCSO) (i.e., Omaha, Nebraska) was patrolling Interstate 80 when he observed a silver Honda Pilot travelling eastbound in excess of the posted speed limit. The deputy conducted a traffic stop on the vehicle and noted that it was bearing California Temporary Registration Tag DB34B04. Deputies contacted the occupants of the vehicle, a male driver and female passenger, and immediately observed the male driver, later identified as FRIERSON, smoking a freshly lit cigarette and sweating profusely.

FRIERSON produced a Michigan driver's license and continued to appear very nervous while searching for the rest of his information. FRIERSON reported that he had rented the vehicle utilizing an app called Turo. When asked where he was coming from, FRIERSON reported that they had visited a friend in Nebraska. The deputy attempted to clarify and asked where the friend lived in Nebraska and FRIERSON appeared to be attempting to think of a response before ultimately ignoring the question. FRIERSON later admitted to having picked up the vehicle in California. The deputy continued questioning

FRIERSON and the female passenger, receiving vague and conflicting information.  It should be noted that the investigation so far has not produced evidence leading to a conclusion that the female passenger is a member of FRIERSON's drug trafficking organization.

The deputy ultimately attempted to gain consent to search the vehicle, which FRIERSON denied. Due to the numerous indicators of criminal activity, a Certified Narcotics Detection Canine was utilized to conduct a "sniff" of the vehicle. The canine alerted on the vehicle.

A search of the vehicle was initiated.  A suitcase, containing male clothing and a cardboard Home Depot-brand box, was located in the cargo area. All of the seams of the box were taped over.  The box contained a safe.  The key for the safe was with the safe.  The key was used to open the safe.  The safe contained vacuum-sealed bags containing in excess of 1,000 grams of fentanyl and nearly 250 grams of heroin.

Also located in the vehicle were two cellphones in the center console **(Cell Phone 10 and Cell Phone 11)**, a grey iPhone on FRIERSON's person **(Cell Phone 12)**, a phone in a pink case belonging to the female passenger (i.e., not one of the **SUBJECT CELL PHONES**), THC edibles, bulk marijuana, and packaging materials which included a vacuum sealer, vacuum bags, gloves, packing tape, and scissors.  After the items were located in the vehicle, the female passenger denied knowledge of the white powdery substance in the vehicle.  FRIERSON, after inquiring about the status of the female passenger, accepted responsibility for everything in the vehicle, but denied knowledge of what the white powdery substance was.  He claimed that he found the box but did not provide a location where he found it.

Both FRIERSON and the female passenger were arrested at the conclusion of the traffic stop on March 20, 2024, and charged with drug crimes in Nebraska state court. After that date, investigators stopped receiving GPS/E911 location data for FRIERSON's prior cell phone and a pen register that was active on that cell phone began to show only incoming phone calls and text messages leading investigators to believe that the prior cell phone was seized by the Douglas County Sheriff's Office during the traffic stop.

### D.      Wiretap Investigation May 2024 to August 2024

As noted above, on May 8, 2024, June 7, 2024, and July 3, 2024, orders were issued in this district authorizing the interception of communications over cell phones used by Devail ADAMS (TT1 and TT4), Christian FRIERSON (TT2 and TT3), Dedric HIGGINBOTHAM (TT5), and George WYATT (TT6). Also as noted above, on August 1, 2024, ADAMS, FRIERSON, WYATT, Roy BROWN, Alexis DONNELL, and Kiara JONES were arrested, and their cell phones – i.e., **Cell Phones 1-9** – were seized and placed into secure law enforcement custody. As detailed below, numerous communications were intercepted from May 2024 to August 2024 establishing that ADAMS, FRIERSON, WYATT, BROWN, DONNELL, and JONES not only were involved in drug trafficking, but also used their cell phones to engage in drug trafficking.

#### 1.      Re-supply and Re-distribution

On the first day of interceptions (i.e., May 9, 2024), calls were intercepted over TT1, used by Devail ADAMS, and over TT2, used by Christian FRIERSON, demonstrating that they were low on narcotics and intended to re-supply in the near future. For example, on May 9, 2024, ADAMS received a call on TT1 from Robert WILLIAMS who was using a phone with number 724-651-2191. Several calls were intercepted

between ADAMS/TT1 and WILLIAMS during which WILLIAMS referred to himself, or was referred to as, "Bob" (i.e., short for Robert).  During the May 9 call, ADAMS informed WILLIAMS that the DTO was low on the yet-to-be-determined kind of narcotics WILLIAMS was looking for – "Aye, shit, we out right now Bob. Tryin' to find some now." WILLIAMS requested confirmation by replying "You're out?", and received it when ADAMS answered "Yeah!"  ADAMS then optimistically told WILLIAMS "You know it ain't gonna be for long though!"  The call ended shortly thereafter.

On the same day as the ADAMS-WILLIAMS call, FRIERSON, using TT2, received a call from Dedric HIGGINBOTHAM/TT5.  During the brief May 9 call with HIGGINBOTHAM, FRIERSON referred to the caller as "Cuz" and asked, "What's the word my baby?" – checking on when HIGGINBOTHAM could re-supply him. HIGGINBOTHAM answered, "Shit, hopefully I'll be down there in, a couple days" – indicating that the re-supply could occur in a matter of days.  FRIERSON then confirmed that he was ready to be re-supplied – "Ok, yeah, that's what I was try'n to figure out, shit I'm waitin' on you!"

The next day (i.e., May 10, 2024), HIGGINBOTHAM, using TT5, once again called FRIERSON/TT2 to discuss the status of the re-supply.  During the brief call, FRIERSON once again confirmed that he was ready to be re-supplied and indicated that he did not want to be losing customers and market share – "Man, wait'n on you, I ain't try'n to be leak'n! But I'll slide down if I need to."  HIGGINBOTHAM replied, "Aight, naw, naw man we, we, I'm get'n it. This shit is about to happen" – indicating that the re-supply of to-be-determined narcotics was imminent.

Later that same day, which was a Friday, FRIERSON, using TT2, and HIGGINBOTHAM, using TT5, once again had a phone conversation about the status of the re-supply of to-be-determined narcotics.  During the call, HIGGINBOTHAM informed FRIERSON that the re-supply would occur the following week – "if you can wait 'til next week, it's come, it's goin' down bro."  FRIERSON responded, "Ok" – confirming the plan to re-supply the following week.

During the days after the May 9 and May 10 calls detailed above, both FRIERSON and ADAMS traveled to Detroit and thereafter returned to New Castle in the WD/PA as revealed by location data for TT1 and TT2 obtained via judicial warrants.  Subsequent intercepted communications indicated that the re-supply did occur "next week" as HIGGINBOTHAM discussed with FRIERSON on May 10.  A call was intercepted on May 17 between Devail ADAMS/TT1 and George WYATT/TT6.  WYATT was one of ADAMS's trusted drug trafficking peers.  During the May 17 call, ADAMS bluntly told WYATT that he (i.e., ADAMS) was "getting ready to hit these keys" – referring to kilograms of to-be-determined narcotics that ADAMS was going to process for re-distribution.  WYATT replied by referencing a yet-to-be-identified customer who wanted to set up a drug deal, telling ADAMS that the customer was "trying to pump at you."  ADAMS then indicated that he was aware that the customer wanted a volume discount for to-be-determined narcotics – "he was talking some 3 for 1 stuff."

Calls intercepted over TT2 on May 22 and May 24 further establish the re-supply/re-supplies of the DTO.  On Wednesday, May 22, FRIERSON received a call on TT2 from HIGGINBOTHAM/TT5.  During the call, HIGGINBOTHAM informed FRIERSON of his plans to travel to the New Castle area in the WD/PA to acquire two

houses – "I got an appointment to be down there Friday morning man. I got two houses I'm about to cop down there."   After FRIERSON replied, "For real?", HIGGINBOTHAM confirmed, "Hell yeah. I guess that's why I'll be down there early in the morning." FRIERSON then informed HIGGINBOTHAM that the DTO is ready to be re-supplied with narcotics after HIGGINBOTHAM arrives in the New Castle area – "Alright, bet. Shit, we waiting on you."   HIGGINBOTHAM responded by re-confirming the plan to travel to the WD/PA for the purpose of acquiring property and re-supplying the DTO – "Friday baby," and then FRIERSON re-confirmed as well – "Alright, bet. Yup, I'm a try to line some shit up."

A call that was intercepted over TT2 between FRIERSON and George WYATT/TT6 two days later on Friday, May 24, confirmed that the DTO had recently been supplied by HIGGINBOTHAM.   During the call, WYATT discussed his desire to sell ounces of FRIERSON's cocaine to make some money – "I need to come down there and flip a couple zips of uhh, a girl."   After further discussing WYATT's financial problems, FRIERSON informed WYATT that the DTO was recently re-supplied with the narcotics WYATT was looking for and that the DTO was processing the narcotics with another substance to increase the volume – "We just grabbed that girl an' shit so. . . . I was about to fatten them bitches up on they ass."   WYATT responded by asking who supplied the DTO – "Yeah. Oh, you just grabbed that shit like from uhh, from Cuz?"   FRIERSON answered in the affirmative – "Yeah."   FRIERSON's statement shortly thereafter during the same call revealed that the "Cuz" WYATT was referring to as the supplier was HIGGINBOTHAM.   FRIERSON stated, "Cuz supposed to be coming down here today. . . . He said he's about to get two houses. He about to buy two houses."

## 2.      Workers and Traphouses

On May 11, FRIERSON, using TT2, and a male, using number 313-419-5936 (referred to as UM5936 and believed to be Quinten JONES), had a conversation about some of the drug dealers FRIERSON and ADAMS had working for them in New Castle. FRIERSON told UM5936 "you done missed your motherfucking spot boy. You know Caesar and Pat ass down here getting that money" – informing UM5936 that he is missing out on an opportunity to make money by dealing drugs for the DTO like Daniel RASNICK and Patrick BROWN are.  Shortly thereafter during the same conversation, UM5936 stated, "Fuck that, I need that" – expressing an interest in dealing drugs for the DTO.  FRIERSON responded, "For real. Yo ass was supposed to been came when I needed you bitch. I was losing money, everything, I got, I had fiends over there working" – informing UM5936 that FRIERSON needed more drug dealers because he had to resort to drug users working the DTO's traphouses.

FRIERSON then informed UM5936 that two of the drug dealers FRIERSON was able to get to New Castle to work for him are "Danny" and "Pat" – "I end up getting Danny ass down here, and then Pat ass came right behind him on some shit."  FRIERSON noted that Danny (i.e., RASNICK / a/k/a "Caesar" and "nephew") and Pat (i.e., BROWN / a/k/a "B") are now making money selling drugs for the DTO – "They both eating now though." FRIERSON then explained that he and ADAMS, a/k/a "Pops" (i.e., FRIERSON's father), are in the process of establishing another traphouse – "We ain't even bust the new place open yet."  UM5936 questioned, "Y'all didn't? The one Pops was at?"  FRIERSON answered, "Nope, we didn't even bust it open yet" – referring to the additional traphouse they are about to establish in New Castle.

On May 18, FRIERSON, using TT2, made an outgoing call to a male who was using number 865-393-4532 (referred to as UM4532). During the call, FRIERSON told UM4532 that he (i.e., FRIERSON) is "out here in PA right now" and that he is "getting busy" – meaning that FRIERSON is in the WD/PA and is busy re-distributing the narcotics he was re-supplied. FRIERSON then told UM4532 that he (i.e., FRIERSON) and ADAMS have two traphouses in New Castle – "We got motherfucking um, we got two places down this motherfucker though for real. Pops just be up at the new one, we got a new one." Referring to the newest traphouse, FRIERSON stated "We starting that bitch off."

As previously noted, FRIERSON/TT2 and HIGGINBOTHAM/TT5 communicated on May 22 about HIGGINBOTHAM's plan to acquire two houses in the New Castle area, likely to serve as additional traphouses for HIGGINBOTHAM and the DTO. A call intercepted on June 4, between TT2/FRIERSON and TT5/HIGGINBOTHAM, revealed that the plan to acquire two additional houses for the DTO had progressed. During the call, HIGGINBOTHAM informed FRIERSON, "I need you man", and then elaborated, "I got two places down there right. I need you to cover, I need two grand tho." Here, HIGGINBOTHAM is referring to two properties located in the greater New Castle area that HIGGINBOTHAM is in the process of acquiring but needs FRIERSON to provide $2,000 to an unidentified person to complete the acquisition. This is corroborated by HIGGINBOTHAM's following communication, "I need you to get a money order and drop it right to him, it's in, it's in umm New Castle." FRIERSON responded, "it'll have to be as soon as I hustle up on it", and HIGGINBOTHAM reiterated, "those ma'fuckers just begged me to get up there and green light just a minute ago", highlighting how quickly HIGGINBOTHAM wanted the transaction to occur. Near the end of the conversation,

FRIERSON indicated he was willing to make the request a priority, "today might be a good day though", and that he would, "hustle up on it today fa-sho."

### 3.     Infiltration and Exploitation

HIGGINBOTHAM's travel to the New Castle area to finalize the acquisition of two new traphouses was delayed in late May.  Subsequent intercepted communications in early June, however, in conjunction with physical surveillance, revealed that HIGGINBOTHAM did, in fact, travel to the New Castle area and did meet with FRIERSON after arriving in the New Castle area.  On June 8, FRIERSON/TT2 and HIGGINBOTHAM/TT5 had a conversation after HIGGINBOTHAM arrived in New Castle (as revealed by, among other things, GPS/E911 location data for TT5 obtained via a judicial warrant).

During the conversation, HIGGINBOTHAM asked, "Hey, where that apartment building at, you was talking about?"  FRIERSON then asked, "Which one?"  HIGGINBOTHAM answered, "The one you said had all the fiends."  FRIERSON then answered, "Oh, ugh. That apartment building is ugh, on the ugh, on the South. It's like on the Sheep Hill."  It is apparent from these questions and answers that FRIERSON and HIGGINBOTHAM had previously discussed an apartment building where drug users resided and HIGGINBOTHAM was interested in checking it out while he was in town.

Shortly thereafter during the same conversation, FRIERSON told HIGGINBOTHAM that he (i.e., FRIERSON) was on his way to another location where drug users live and invited HIGGINBOTHAM to meet up with him to review that location – "We about to pull up in the Neshannock projects. . . . Pull up on me ugh, and we can just

what's his name, ride through that motherfucker."  HIGGINBOTHAM replied, "Alright, I'll see you in a minute."

When the call ended, FRIERSON/TT2 texted HIGGINBOTHAM/TT5 – "Neshannock avenue apartments" – informing HIGGINBOTHAM of the name of the apartment complex they were going to check out together.  Following the call and text message, physical surveillance resulted in the observation of FRIERSON and HIGGINBOTHAM meeting near a convenience store in New Castle.  They then traveled in their vehicles away from the convenience store, ultimately arriving at FRIERSON's residence on Highland Avenue.  Physical surveillance was thereafter terminated to avoid being spotted by HIGGINBOTHAM and/or FRIERSON.

On June 10, after HIGGINBOTHAM returned to Detroit, he had a conversation over TT5 with Tyrone DAVIS who was using a telephone with number 313-774-7554. The conversation revealed HIGGINBOTHAM's plans to not only set up two new traphouses in New Castle, but also to recruit young people from Detroit to deal drugs from the traphouses for him.

During the conversation, HIGGINBOTHAM asked DAVIS if they had any young people who were willing to re-locate to New Castle to deal drugs for them – "Man, we ain't got no young niggas 'round to go out of town?"  DAVIS answered that a person he would trust to re-locate for that purpose was not available at that time because that person got a job – "the nigga I can trust shit is nigga close shit. That nigga got a job now." HIGGINBOTHAM expressed his frustration at not having young drug dealers to staff his traphouses in New Castle – "Damn, man I got this shit set up now man ready to go." Shortly thereafter during the same conversation, DAVIS volunteered to work one of the

traphouses in New Castle – "shit nigga I will go down there then fuck that man." HIGGINBOTHAM declined the offer because DAVIS was too important to HIGGINBOTHAM's drug trafficking operation in Detroit – "Man, naw, I need you here. Stay on top of these dummies man."

Also on June 10, HIGGINBOTHAM had a conversation over TT5 with FRIERSON/TT2. At the time of the lengthy conversation, FRIERSON was at the hospital where a girlfriend was about to give birth to their child. Near the beginning of the conversation, HIGGINBOTHAM referenced some of the complications he was having acquiring and preparing the two new traphouses for the DTO in New Castle – "They made a nigga put a deposit down on lights and I'm like damn, that some hoe shit bro."

FRIERSON then transitioned the conversation to the subject of acquiring traphouses in other towns in the area, such as in Ellwood City in Lawrence County – "Yep, yep, I told you and I just was riding through Ellwood though this like the way going to Pittsburgh. . . . It's nice through there you seen it?" HIGGINBOTHAM then expressed a concern about appearing to be an outsider – "Man that shit is all white bro" – and FRIERSON addressed that concern – "Yep that's what I said, that's what I said. If a nigga try to do something out there you gotta be, got to have the white nigga with you."

FRIERSON went on to inform HIGGINBOTHAM that he was developing a plan to place Daniel RASNICK (a/k/a "UM8916," "Caesar," "nephew"), one of the DTO's workers, in a traphouse in Ellwood City to deal narcotics for the DTO – "I was thinking like Danny would be perfect out there." HIGGINBOTHAM replied with approval of that plan – "you got to buy they, buy his house out there. To put him out there. See, I we, I would go halves with you and do that shit bro."

The subject of the conversation then changed to the apartment complexes in the New Castle area that HIGGINBOTHAM checked out for the purpose of identifying drug customers and distribution locations. HIGGINBOTHAM stated, "them projects man, I went to every project out there." HIGGINBOTHAM then stated, "you can't get up in them projects unless you got somebody on welfare or somethin', so a nigga got to hook up with" – expressing a desire to find low-income people to exploit to get the DTO into the projects. FRIERSON replied that he had already infiltrated those locations in New Castle – "I got people in every projects down here." FRIERSON then noted that members of the DTO need to be careful when trafficking narcotics in the projects because of surveillance cameras – "You can't be riding in the projects there's cameras everywhere." HIGGINBOTHAM replied, "Man, and I was about to tell you that, that's why I say man you crazy thinking them motherfuckers ain't on you, and you riding Detroit plates."

The conversation then turned to the subject of how drug dealers are sentenced in Western Pennsylvania if they get caught. FRIERSON stated, in reference to state court, "what they do is throw sweet deals for everybody, anybody that gets caught with anything bro, they going to throw you a sweat deal." FRIERSON elaborated, "it doesn't matter what you get caught with man, I'm talking about they going to give you a couple years man you out."

FRIERSON went on to tell HIGGINBOTHAM that even large-scale drug traffickers get sweet sentences, even in federal court, in Western Pennsylvania – "even the feds don't hang you though dog. My brother's baby momma, he got caught on a conspiracy with some niggas up in Beaver Falls. They end up giving him like two years, two-and-a-half years and another nigga like five years, the the head nigga. The top nigga got five years

and it was on conspiracy for like, I think it was like five, five, five, or ten chickens or some shit like that."

FRIERSON went on to tell HIGGINBOTHAM that the way drug dealers are sentenced in Western Pennsylvania "don't even make sense" and that it would be a bad idea for them to engage in drug trafficking in Detroit instead of in Western Pennsylvania – "Don't make no sense to go back home man, I can do what I want."  According to FRIERSON, for drug traffickers in Western Pennsylvania, "Streets paved in gold down this mug man."

FRIERSON then further expressed his desire to expand the DTO to towns beyond New Castle in Western Pennsylvania – "And it's sweet cause we ain't even scratched the surface yet Cuz, we only in one little spot. This so many places around this people. People that be coming to, people from around here be coming to New Castle. From places around here so we can man touch every part of this motherfucker."  HIGGINBOTHAM agreed with the plan to expand the DTO to infiltrate other communities beyond New Castle – "That's right. That's why you need. We got to hook. Man, that's why I'm a be down there with you man. We got to hook up with some white niggas man."

FRIERSON thereafter concluded that particular part of the conversation by expressing his optimism that the DTO will further infiltrate other communities with HIGGINBOTHAM's assistance – "I just needed. That's all I needed. All I needed was you Cuz, a nigga like you bro, it's over with man."  HIGGINBOTHAM expressed his optimism as well – "Man, you watch what's about to happen though."

On June 16, HIGGINBOTHAM/TT5 and FRIERSON/TT2 had another conversation, this time about how to salvage crack cocaine that was not processed properly.

25

HIGGINBOTHAM had the crack cocaine to supply, but was concerned about its quality, and, as a result, consulted FRIERSON.  Referring to the cocaine as "work" that someone messed up, HIGGINBOTHAM asked FRIERSON what FRIERSON added to a prior supply of cocaine to salvage it – "Hey, that shit you said you had to put, what you put on it? You said a sprite?"  FRIERSON answered, "Ahh, ahh, ahh, naw like Casamigos, that Cristalino."  HIGGINBOTHAM asked for confirmation that it was some kind of liquor – "Ca- some liquor?", and FRIERSON confirmed that it was – "Yeah."

HIGGINBOTHAM then further explained that he was asking because someone "burnt some work of mine man, I'm tryin' to see how to fix it man. It turnt, it fucked it up. . . . And he, he was doin' it without puttin' soda on it" – referring to someone who did not cook HIGGINBOTHAM's cocaine into crack properly.  FRIERSON once again endorsed Casamigos and stated "Definitely will change the taste for sure, if it's the taste."

One minute after discussing the subject with FRIERSON, HIGGINBOTHAM called Roy BROWN/248-520-6010 and told him "Man put some Casamigos, they said that'll change it."  BROWN replied, "Migos, alright."  HIGGINBOTHAM immediately followed up with the statement "That'll change the taste if they, if they, if it ain't straight right now. First try that though, but, Casamigos it'll do it" – once again referring to salvaging improperly processed crack cocaine.

Several calls were intercepted in June and July 2024 between HIGGINBOTHAM/TT5 and Roy BROWN/x6010.  During the calls, HIGGINBOTHAM and BROWN discussed the operation of their drug trafficking business, sometimes in code and sometimes more openly.  Also during the calls, HIGGINBOTHAM referred to BROWN as "Roy."  For example, on June 15, HIGGINBOTHAM called BROWN/x6010

and referred to him as "Roy" twice during the same conversation – "Roy man" and "everything is done Roy." Again, on June 19, HIGGINBOTHAM called BROWN/x6010 and referred to him by his first name – "Good morning, Roy boy."

HIGGINBOTHAM called Devail ADAMS on several occasions using an alternative phone with number 313-721-2306. Several communications between HIGGINBOTHAM/x2306 and ADAMS/TT1 were intercepted. HIGGINBOTHAM was confirmed as the user of the x2306 number by, among other things, the sound of his voice as well as by the content of the calls that closely corresponded with calls over TT5.

On June 17, HIGGINBOTHAM/x2306, who was not in New Castle, and Devail ADAMS/TT1, who was in New Castle, discussed ADAMS assisting HIGGINBOTHAM by picking up the keys from the real estate company for at least one of the traphouses that HIGGINBOTHAM acquired:

DH:   Man you think you picked them keys up for me, to the house?
DA:   Where dey at?
DH:   I'ma send you the address and stuff.
DA:   Okay.

Later that same afternoon, HIGGINBOTHAM/x2306 and ADAMS/TT1 discussed additional details regarding the plan for ADAMS to pick up the keys for a traphouse from the real estate company. HIGGINBOTHAM indicated that the location was being acquired under his girl's name – "That's my girl name" – but when ADAMS asked, "how do you pronounce the last name?", HIGGINBOTHAM did not know – "Man I don't know. Lemme call her and find out."

They then discussed a cover story to address the possibility that someone from the real estate company could ask ADAMS why he is picking up the keys. ADAMS stated, "Alright, but look though, so what's my story? I'm her brother?" – inquiring if he should

pretend to be the brother of HIGGINBOTHAM's girl whose name was being used to acquire the property.  HIGGINBOTHAM answered, "You just, yeah her brother you just comin' in to get the keys, you given 'em the money and gettin' the keys."

The conversation between ADAMS and HIGGINBOTHAM about the keys to the property gained added significance as context for a call between ADAMS/TT1 and George WYATT/TT6 that occurred the next day.  On June 18, ADAMS and WYATT discussed HIGGINBOTHAM, i.e., "Cuz," and how ADAMS paid HIGGINBOTHAM for fentanyl HIGGINBOTHAM previously supplied – "I had to pay Cuz a thousand dollars. I mean, I had to, well I owed him. But, he sent me to grab some keys for a place, so, pick up some keys for a new house."

ADAMS then informed WYATT that ADAMS was not ready to pay back the full drug debt owed to HIGGINBOTHAM because they had other fentanyl ("boy" and "dog" are common coded terms for fentanyl) to sell before they started selling the fentanyl that HIGGINBOTHAM supplied – "I really wasn't ready to pay him because when, when I even got. When I even got the ahh, the girl from him, I mean the boy from him I told him. I said Cuz, you going to have to wait. . . . 'cause we got a lot of dog, so, you going to have to wait for us to finish."  ADAMS went on to specify that he paid $2,000 of the $2,500 drug debt owed to HIGGINBOTHAM – "I still gave him, I owed him 25, I gave him 2000 of it. I really couldn't afford, I wanted to wait."

WYATT replied by asking whether HIGGINBOTHAM was upset about not receiving the additional $500 -- Man, he got mad about the 500?"  ADAMS indicated that HIGGINBOTHAM was not upset and mentioned that FRIERSON (a/k/a "Juicy") owes HIGGINBOTHAM a drug debt as well – "Naw, hell naw. Naw, Juicy, Juicy, I owe him

umm, 500, and Juicy owe him umm, 15." ADAMS emphasized that he promptly paid his debt to HIGGINBOTHAM for cocaine (a/k/a "girl") that HIGGINBOTHAM supplied – "But I paid his ass quick on the girl. Like, I owed him 3000 on the girl. I paid, I paid that, I paid him that in like a week." WYATT expressed his understanding, replying "Right."

TT4, in addition to TT1, was possessed and used by ADAMS as an alternative, high-frequency phone to communicate with some of the DTO's workers and customers. One of the workers/customers that ADAMS/TT4 communicated with is Kendra SAGER/724-355-8760. A text message ADAMS/TT4 sent to SAGER on June 12 revealed that, as of that date, ADAMS was not pleased with SAGER because SAGER was not dedicated to forwarding the rest of the drug proceeds (a/k/a "cheese") to ADAMS as soon as possible – "One of the most important things in any relationship..... is loyalty for sure, now I've shone you the type of dude I am now what do you plan to show me? You ain't brung me one nickel of my cheese....but to top that off you shopping and spending whatever you spend whether it's a dollar or a hundred you spending it somewhere else, you might wanna rethink that frfr and have a conversation with me about what you owe me".

SAGER called ADAMS/TT4 that same day in response to ADAMS's text message. SAGER started the call by telling ADAMS that what he stated in the text message was correct and by noting that she did forward some drug proceeds to the DTO by paying George WYATT (a/k/a "Unc") – "Hey! No, you're completely and totally right. The money that I had brought Unc today was my dues, was a like, for him to end up pulling off on me."

The rest of the conversation between ADAMS and SAGER demonstrates the lengths to which members of the DTO would go to exploit desperate people so that the

DTO could, among other things, hide behind them and sell narcotics from their residences. SAGER told ADAMS where she was staying recently – "I've been down Harrison Street at my girl's house."  ADAMS jumped on SAGER's statement regarding where she was staying, repeatedly asking SAGER about who the girl is – "Who is that? . . . . Who is that?"

When SAGER answered, "She's by herself, her kid's in jail. She literally has no money, no income," ADAMS immediately stated, "She need us man!" – sensing the possibility that the DTO could hide behind the woman, take over her house, and turn it into a traphouse.  When SAGER expressed some lack of understanding – "Huh?" – ADAMS responded by telling SAGER that she should have told him about the traphouse opportunity sooner – "See, that's what I'm saying. See, this is how, this is how you show me that you fuck with me. You supposed to bring me shit like this. Why you just now telling me?" SAGER explained that she did not try to immediately exploit the woman because SAGER needed to condition her for it – "I got to wait until she. She just now getting comfortable with me being there with drugs. Like, she's an addict but she let me take her car."

ADAMS then told SAGER that all she needed to do was link ADAMS up with the woman and ADAMS would take the lead in convincing her to allow the DTO to sell drugs from her house – "Yeah, but all you got to do is just make the introduction man."  SAGER thereafter stated that she would forward the woman's address to ADAMS – "I'll send you the address."  ADAMS responded with approval – "Man, that's what I'm saying man. That's what I'm saying Kendra."  ADAMS then expressed his desire to follow up on the opportunity to hide behind the woman and turn her house into a traphouse – "I'm about to see because that's the shit that's valuable to me, a place for us to motherfucking get some money."

4.    **Frank CHRISTIAN Supplies the DTO**

Communications intercepted over Devail ADAMS/TT1 and George WYATT/TT6 demonstrated that they acted as partners in supplying the DTO's customers and in securing an additional source of supply – i.e., Frank CHRISTIAN – for the DTO.  For example, on June 10, ADAMS/TT1 called WYATT/TT6 and told WYATT that an unnamed customer wanted to purchase cocaine ("her") and fentanyl ("him") – "He wanted umm, 40 of her and 20 of him."  WYATT replied by telling ADAMS that he was out of fentanyl at that particular moment in time and needed more fentanyl from ADAMS – "I ain't got no him that's why I was fitting to call you and tell you to bring me the him."  ADAMS responded, "Ok" – agreeing to bring fentanyl to WYATT.

On June 11, WYATT/TT6 called ADAMS/TT1 about securing a new source of supply for the DTO – i.e., Frank CHRISTIAN a/k/a "Baby Frank."  CHRISTIAN has been a well-known drug trafficker in the New Castle/Lawrence County area for years.  He has an extensive criminal record that includes two prior federal heroin and cocaine trafficking convictions, and prison sentences, during the last 25 years.  He was on federal supervised release in 2023 and 2024 while being supervised out of Atlanta, Georgia.

During the June 11 call, WYATT told ADAMS that WYATT was in the process of securing a supply of fentanyl ("wap") – "Got that wap on the way baby!"  ADAMS replied, "Oh, the wapity wap" – recognizing what WYATT was talking about.  WYATT then told ADAMS who he was going to get the fentanyl from – "Yeah, from ugh. I don't know if you, I don't know if you met 'Baby Frank' before."  WYATT went on to explain that CHRISTIAN was going to start off by supplying them with a smaller quantity of fentanyl

so that they could test the quality on their customers – "He's just brining it over here for a tester." ADAMS responded with agreement, "Ok."

During the same conversation, WYATT conveyed additional background information about CHRISTIAN to ADAMS, explaining that CHRISTIAN has been a major drug trafficker in the area for years and is currently based out of Atlanta – "he been down here for years man. This nigga was runnin' this bitch for a long time. Riding through here in brand new Porches. Brand new Benz's and all that shit. He down in Atlanta now, got his own trucking company."

WYATT went on to highlight that, according to WYATT, CHRISTIAN's criminal history includes not only major drug trafficking but also murders – "That nigga done beat five bodies down this bitch." ADAMS expressed his admiration – "Oh, yeah. So, he be doing somethin' right huh." WYATT responded, "Yeah, yeah. Hell yeah. He beat them motherfuckers. I was in the county jail when he beat one, the motherfucker was telling me before I met him, that he beat several of them bitches."

Near the end of the conversation, WYATT told ADAMS that CHRISTIAN was going to meet with WYATT to provide the fentanyl to WYATT – "Yeah he 'posed to be dropping it off to me." ADAMS replied, "Ok." WYATT then informed ADAMS that CHRISTIAN would likely charge $30 per gram of fentanyl – "That nigga want 30 a gram for that shit."

The next day, June 12, ADAMS/TT1 called WYATT/TT6 to work out additional details regarding the fentanyl from CHRISTIAN. ADAMS referenced "Juicy" (i.e., Christian FRIERSON) being in on the deal. ADAMS stated that they would collectively get 100 grams of fentanyl to start off – "we all gonna end up with 100 yams." ADAMS

then conveyed his math that, based on $30 per gram as previously discussed, the total price for 100 grams would be $3,000, and ADAMS, WYATT, and FRIERSON would each owe $1,000 – "I got um, that's gonna, that's a 1000 a piece right?"   WYATT agreed with ADAMS's math – "Yep!"

ADAMS and WYATT then congratulated themselves on their teamwork in securing more fentanyl to distribute in the New Castle area.  ADAMS stated, "You got to be on the team, you got to be on the team dog!"  WYATT agreed, "That's right, we gotta be teamworking baby!"  ADAMS replied as if fentanyl trafficking was like playing football – "Yeah, that's means at any point in time, anyone of us can be quarterback!"  WYATT very much agreed with the football comparison – "God damn right."

Two days later, on June 14, ADAMS/TT1 called WYATT/TT6.  WYATT's statements during the conversation confirmed that the DTO had been supplied fentanyl by CHRISTIAN and CHRISTIAN was pressing WYATT to meet again for the rest of the money owed to CHRISTIAN for the fentanyl.  WYATT stated in reference to CHRISTIAN and the fentanyl debt – "Man that nigga man, that nigga on my ass about that 500 man! Man, all this motherfuckin' mornin' man! Ya want me to pull up, want me to pull up." WYATT then provided additional details identifying CHRISTIAN – "Frank about 40, maybe 50" and "you mention his name, everybody know who 'Baby Frank' is."

On June 18, ADAMS/TT1 and WYATT/TT6 once again discussed paying CHRISTIAN for fentanyl supplied by CHRISTIAN.  WYATT told ADAMS that he was about to meet with CHRISTIAN – "I'm fitt'n to pay Dog right now, I told him to pull up on me in about 30 minutes."  ADAMS expressed his understanding – "Oh, ok" – and then mentioned that FRIERSON a/k/a "Juicy" would owe WYATT for some of the money

WYATT provided to CHRISTIAN – "Juicy owe you then." WYATT agreed and indicated that he would work it out with FRIERSON – "Right, right I'll get it 'cause I got his shit, I'm gonna get by."

At least two meetings between WYATT and CHRISTIAN in New Castle have been confirmed through recordings from Public Housing Authority surveillance cameras of a parking lot where they met on two occasions. Both meetings occurred while there was daylight. One meeting occurred on June 11, 2024, and the other meeting occurred on June 18, 2024. Case agents for this investigation are familiar with what WYATT and CHRISTIAN look like and with a vehicle CHRISTIAN has been operating. They reviewed the recordings and recognized WYATT, CHRISTIAN, and the vehicle.

Even more recently, on July 24, WYATT/TT6 spoke with an unidentified male, who will be referred to as UM1871, about a downgrade in the quality of crack cocaine CHRISTIAN recently supplied. At the beginning of the call, WYATT told UM1871 "I want to beat the shit out of Baby Frank dog!" UM1871 asked, "He did you dirty?", and WYATT immediately replied, "he did me dirty dog." UM1871 sympathized, "he always do that. He going to come through the first time and then when he come back it's going to be fucked up." WYATT agreed, "Yeah, then the nigga tell me, aww man, it just came off the same brick," meaning the cocaine supply was part of the same kilogram of cocaine that WYATT was provided during a previous transaction.

WYATT then provided further details on CHRISTIAN's excuse for the crack cocaine being overcooked, "Talk about ugh, I must have burned it up. I said dog listen, I've been cooking crack since before you was born. You can't burn it up!" UM1871 agreed, "hell naw, you can overcook that motherfucker, but it's still going to be there." WYATT

further explained, "As soon as I put that bitch in the microwave, he hadn't even got out the parking lot of Sciota, and I looked at the stuff, man this is some straight soda man!" – referring to baking soda which can be used to process crack cocaine.

      **5.**       **Worker "B"/Patrick BROWN & Alexis DONNELL**

Communications intercepted over TT1 and TT4, both used by Devail ADAMS, confirmed that one of the drug dealers the DTO had working its traphouses was a male referred to as "B," subsequently identified as Patrick BROWN.  For example, on June 16, ADAMS/TT1 spoke with Robert WILLIAMS/724-651-2191.  During the call, WILLIAMS ordered a quantity of narcotics, likely fentanyl – "Hey I'm on my way but put me together a couple?"  After ADAMS agreed to the drug deal – "Yeah I got you" – WILLIAMS asked if he would be receiving the same narcotics from ADAMS that B was selling for the DTO – "Alright, is that what is that what uh B has that new stuff?"  ADAMS responded in the affirmative, "It's, uh, yeah."

Also on June 16, ADAMS/TT1 spoke with Alexis DONNELL/724-730-0066 and received a negative report on the quality of the new stuff, likely a mixture containing fentanyl that the DTO cut with at least one other powdery substance.  DONNELL, referring to her customer, stated "my people said that shit is trash straight trash."  ADAMS expressed disbelief because other customers who received it from one of the DTO's traphouses, referred to as "the coop" or "the bungalow," and often worked by B, provided positive feedback – "I don't understand it though cuz shit they liking all in the coop."

It should be noted that many communications were intercepted between ADAMS/TT1 and Alexis DONNELL/x0066, between May 2024 and August 2024, establishing DONNELL's use of her cell phone to engage in drug trafficking.  For example,

on May 16 ADAMS made arrangements for a drug deal with DONNELL/x0066.  Several calls were intercepted between ADAMS/TT1 and DONNELL/x0066 during which DONNELL was referred to as "Lex" or "Lexi" (i.e., short for Alexis).

At about 5:55 p.m. on May 16, DONNELL called ADAMS/TT1.  During the call, ADAMS stated "Damn, what they wanted?" – asking DONNELL what her customers wanted to purchase.  DONNELL answered, "Seven" – referring to a quantity of narcotics.  ADAMS then indicated that he was willing to do the deal – "Oh damn, I can't pass on that can I."  Near the end of the call, DONNELL asked ADAMS how much he would charge for the narcotics – "You get the, you want 60 right?"  ADAMS answered, "Yep" and told DONNELL "I got you."

Shortly after this May 16 call ended, DONNELL, using her x0066 phone, texted ADAMS/TT1 "I meant too say 50".  This message informed ADAMS that she meant to ask if ADAMS would charge a lower price for the narcotics.  Throughout the rest of the evening, ADAMS/TT1 and DONNELL/x0066 exchanged several phone calls discussing when and where to meet to complete the drug deal.

DONNELL/x0066 and ADAMS/TT1 continued to use their phones to set up drug deals following their May 16 drug deal.  For example, on May 27, DONNELL/x0066 called ADAMS/TT1.  ADAMS answered the call by stating "What's up Lex?"  DONNELL promptly informed ADAMS that she was calling to be supplied with narcotics because her supply was low – "Yeah cuz I need to pick up, I'm down some."  ADAMS replied that he was "headed to the south" – i.e., a particular part of the New Castle area – and DONNELL asked about her meeting with FRIERSON, a/k/a "Juicy," instead of traveling to the south to meet up with ADAMS – "Is Juice still over there?"  When ADAMS informed

36

DONNELL that FRIERSON was on the east side – "Uh think he on the east side or some shit" – DONNELL agreed to meet ADAMS to be supplied with narcotics – "Alright I'll meet you on the South in a sec."

On June 17, ADAMS, using TT4, received two text messages, likely from B using a phone with number 724-202-9513, directing ADAMS a/k/a "Pops" to call one of the DTO's customers named "Amber" at a particular phone number.  The first text message stated "Amber +1 878-244-0783" and the second text message, received only seconds later, stated "Call her pops".

About one minute later, ADAMS/TT4 called Amber/878-244-0783.  After asking "who is this?" and being informed "Amber," ADAMS told Amber that "B gave me your number. He said call you."  Shortly thereafter, ADAMS asked Amber what drugs she wanted to buy – "what did you wanna get?"  Amber answered that she wanted two different to-be-determined drugs and explained that she was recruiting another customer for the DTO – "A half of each but can I pay 30 for it this time. And I swear like I'll prove it to you, like I'm turning somebody onto this. Like they want better shit."  After hearing this from Amber, ADAMS indicated that the DTO would supply Amber through B – "Aight, I'll call B."

The next day, June 18, ADAMS/TT4 exchanged a series of text messages with a male using a phone with number 724-496-9030, who will be referred to as "UM9030." The text messages revealed that B had arranged a drug deal (kind of drug to be determined) that was to be completed on that particular day by ADAMS.  UM9030 texted, "Yo, B told me to call. I'm in a car and can't talk though. Is it okay if I text what I needed?"  ADAMS replied with texts informing UM9030 where to travel to for the drug deal and asking what

kind of car UM9030 was in – "3505 west Pittsburgh road" and "I'm I the very first apartment I'm gonna be looking out what are you in".  UM9030 answered with a text informing ADAMS when he would be there, what kind of car he would arrive in, and that the driver was not aware of the drug deal that was about to happen – "Okay, I'm on the way now. I'll be about 16 minutes. I'm in an Avenger, but I have a driver that doesn't know what I'm doing so I'll have to jump out. I didn't know if he mentioned that."  ADAMS answered with texts informing UM9030 that he could enter the building – "Yeah you can come in" and "It's the first building the door is open last door on the right".  UM9030 thereafter texted ADAMS that he had arrived to do the deal – "Okay, here".

### 6.      Interceptions in Late June 2024

On June 22, during the afternoon, HIGGINBOTHAM/TT5 exchanged calls with Jermaine LETT who was using a phone with number 734-742-9050.  The immediate purpose of the calls was to determine where HIGGINBOTHAM and LETT were going to meet at that time.  At 2:59 p.m., LETT called HIGGINBOTHAM/TT5 and they confirmed that they would meet at the house of a particular female.  LETT stated, "Uh comin' over girl house?"  HIGGINBOTHAM agreed to meet there – "That's cool."

One hour later, at 3:59 p.m., Dedric HIGGINBOTHAM/TT5 spoke with DAVIS, who was using number 313-774-7554.  HIGGINBOTHAM got right to the point during the brief conversation, referencing a high-volume fentanyl supplier, likely LETT, and informing DAVIS that HIGGINBOTHAM was bringing a quantity of fentanyl for DAVIS to have tested by their customers – "Man, nigga talkin' about he got bricks of that fetty man, I about to bring you a tester down we got be on it though bro, we gotta be on it."  DAVIS agreed to focus on getting the fentanyl tested as soon as possible – "Nigga I got to

be all on this shit."  HIGGINBOTHAM then reiterated that he was on his way to DAVIS

with the fentanyl to be tested – "That's what I'm alright so I'm on my way to ya to bring it."

About 13 minutes later, HIGGINBOTHAM/TT5 called DAVIS to discuss where

to meet to transfer the fentanyl from HIGGINBOTHAM to DAVIS.  HIGGINBOTHAM

stated, "Yo you wanna meet me in the hood?"  DAVIS agreed to meet at that location –

"In the hood yeah I'm ah I meet over der."

About an hour later, DAVIS called HIGGINBOTHAM and conveyed a negative

report from some of their customers on the quality of the fentanyl mixture.  DAVIS stated,

"Yo man they talkin' 'bout they don't feel shit."  After HIGGINBOTHAM replied, "Ah

Huh?", DAVIS elaborated – "They don't feel they talkin' bout some flour or some sugar in

there man."  HIGGINBOTHAM then said that the supplier "talkin' they got bricks of that

shit" – referring to kilograms of fentanyl.

On June 25, HIGGINBOTHAM/TT5 called LETT/x9050 and engaged in a

conversation further revealing that their meeting on June 22 at a particular female's house

was related to drug trafficking.  During the June 25 call, HIGGINBOTHAM stated, "You

ain't got no young niggas to take down there?" – asking if LETT had any young people

who could re-locate to New Castle to work HIGGINBOTHAM's traphouses.  LETT could

not think of a good candidate at that particular moment in time – "Ugh, damn, ugh, I got to

think about it. Not right off the rip."

Thereafter, during the same call, HIGGINBOTHAM asked, "Did you talk to girly?"

– referring to speaking to a particular female, likely about securing a supply of fentanyl.

LETT did not state that he had contacted the female, but did state that he was thinking

about doing so – "I was thinking about that U/I yeah."   HIGGINBOTHAM then

emphasized that they were ready to do a big drug deal, stating "We ready baby" and then stating "We need a major move baby. So, we both can get out of this shit." LETT agreed, "Right, right. Ok." LETT also agreed to call the female – "Ok. let me make a couple calls and see whats up."

Later that same day, LETT called HIGGINBOTHAM/TT5 and indicated that he spoke with the female as requested earlier that day. HIGGINBOTHAM asked if she was willing to do the drug deal – "she's wid it?" LETT confirmed that she was willing to do the drug deal, stating that she is "ready, set, go." HIGGINBOTHAM and LETT then discussed meeting up that day.

Two days later, on June 27, HIGGINBOTHAM/TT5 received another call from LETT/x9050. During the conversation that followed, LETT and HIGGINBOTHAM discussed a female who LETT was going to give money to, likely to secure a supply of fentanyl. Near the beginning of the call, LETT stated, "Trying to get this shit together" and "baby girl will be there about, about 12, 1 o'clock." HIGGINBOTHAM asked for clarification, "she'll be what?", and LETT stated, "she'll be here today. Gonna give her that money so she can start makin' it, get her ahh, stuff together."

On June 29, HIGGINBOTHAM/TT5 made an outgoing call to DAVIS/x7554 to further discuss the quality of narcotics the DTO had recently been obtaining and HIGGINBOTHAM's intention to meet with a narcotics source of supply. DAVIS sated, "It's on the low low fo' 4 months now," and HIGGINBOTHAM responded, "It's cool, it's cool. We'll be good. We gon' be back right," suggesting that HIGGINBOTHAM had a plan to procure higher quality narcotics. HIGGINBOTHAM then affirmed his intent to meet with a narcotics source of supply – "I'm gonna ride down there see what's popping

man, fuck it." DAVIS responded by emphasizing the recent deterioration of the quality of their narcotics that was resulting in a loss of customers – "When the shit was good everybody was flocking to us. Man what happened?"

As the conversation continued, HIGGINBOTHAM made reference to the kilogram quantities of narcotics being of poor quality, "bricks down here and that shit is straight up garbage." DAVIS agreed, theorizing that part of the problem may be narcotics traffickers adding too much cut to the narcotics to increase volume – "prolly try to hit it too much." HIGGINBOTHAM opined that the narcotics were of poor quality to begin with, "Man I think them bitches coming fucked up bro!"

HIGGINBOTHAM and DAVIS then discussed the origins of fentanyl. DAVIS informed HIGGINBOTHAM, "that's what the custo told me yesterday, man he's like, I thought y'all was getting that shit from China. I'm like what!" HIGGINBOTHAM confirmed, "Yeah that's where that shit come from dog. That fetty!", and "unless you get one of the Mexicans that got the, that had the original shit." HIGGINBOTHAM then informed DAVIS with respect to the fentanyl, "my man said he got it, he said he, said he got it, he just can't, he just said nobody wants to drive it back." HIGGINBOTHAM then informed DAVIS, "I'm about to go down there tomorrow man, Monday, fuck that."

### 7.    July 2024 Arizona Fentanyl Supply Trip

Calls intercepted over TT5/HIGGINBOTHAM AND TT1/Devail ADAMS during the first half of July 2024, combined with other investigative steps, revealed that Dedric HIGGINBOTHAM and Jermaine LETT traveled to Arizona, secured a large supply of fentanyl, and were thereafter waiting for the fentanyl to be transported to Detroit.  On July 4, HIGGINBOTHAM/TT5 and LETT/x9050 called each other several times and discussed

flying to Arizona as soon as possible.  HIGGINBOTHAM stated, "We gotta go today. We out."  Lett replied, "Hell yeah shit. I'm trying to see what's up."  HIGGINBOTHAM then said "Alright I'm with the shit man."

Later that day, an unsuccessful attempt was made to purchase airline tickets for them in cash.  A successful non-cash purchase of the tickets was then made, further confirming their identities.  They then flew from Detroit to Arizona early the next morning.

HIGGINBOTHAM's TT5 was conspicuously off from July 5 to July 8 while he was in Arizona.  No communications were intercepted and no GPS/E911 location data was received for the phone during that time period.  It is believed that HIGGINBOTHAM turned TT5 off while he was in Arizona to thwart law enforcement surveillance.

Fortunately, HIGGINBOTHAM used his other cell phone, with number 313-721-2306, to communicate with ADAMS/TT1 on July 6 while HIGGINBOTHAM was in Arizona.  It appears that HIGGINBOTHAM considered the x2306 phone to be his personal phone (i.e., not his drug trafficking phone).  He must have had the number for ADAMS/TT1 saved in the x2306 phone, and not in TT5, because he consistently used the x2306 phone to call ADAMS/TT1 to discuss drug trafficking.

During the July 6 call between HIGGINBOTHAM/x2306 and ADAMS/TT1, they had the following exchange further revealing that HIGGINBOTHAM was on a business trip to secure a supply for the DTO, the business of the trip was going well, and he would be back in Detroit early the following week:

DA:   Aw there ain't nothin' to it, just checkin' on you.
DH:   Out here in the desert baby (laughter).
DA:   U/I Beautiful. I know the sun prolly shinin'!
DH:   Man it's 115 down here.

DA:   Ah man, you don't even got, ain't no, ain't no uhh (to someone in the background: the other way) ain't no, ain't no U/I that you headed to for water or some shit like that?

DH:   Man, out here, I'm standin' on business. (laughter)

DA:   Oh yeah, shit you ain't got U/I f'sho. Alright U/I.

DH:   I'm standin' on business, dog.

DA:   (laughter)

DH:   I'm on real stuff.

DA:   That's what's up.

DH:   Whatchu doin'?

DA:   Uhh out here messin' with the kids in this pool.

DH:   Oh alright, chillin' chillin'. So I should be back Monday, man, so.

DA:   Ok.

DH:   Ain't nothin' but good news, we ready.

DA:   Yep yep f'sho f'sho.

HIGGINBOTHAM and LETT were back in Detroit during the morning of July 9. HIGGINBOTHAM turned TT5 back on and used it to exchange communications with not only LETT but two other Detroit-based members of the DTO, Roy BROWN and Tyrone DAVIS.  As further detailed below, HIGGINBOTHAM was observed meeting up with DAVIS on July 9 at DAVIS's residence, likely to discuss the Arizona trip and their plans for when the fentanyl supply arrived in Detroit.

Also on July 9, HIGGINBOTHAM/x2306 called ADAMS/TT1 and told ADAMS that he was back in Detroit and would now be waiting for the fentanyl supply to arrive. HIGGINBOTHAM stated, "I jus' got back and I'ma have ta wait, I'm waitin' around. So I'll call ya in the morning."  ADAMS replied, "Ok."

The next day, July 10, HIGGINBOTHAM/TT5 called Roy BROWN and confirmed that the DTO was in the waiting stage – i.e., waiting for the fentanyl supply to be transported, likely across the U.S./Mexico border to Detroit (and then part of it to New Castle).  BROWN asked, "Still on the waitin' biz huh?"  HIGGINBOTHAM answered optimistically, "U/I it's coming baby."

8.      **Apartment at 219 East Lincoln Avenue, New Castle, PA**

Between May 2024 and August 2024, Devail ADAMS resided with Kiara JONES in her apartment located at 219 East Lincoln Avenue in New Castle, Lawrence County, in this district.  GPS/E911 location data for ADAMS's TT1 cell phone was obtained approximately every 15 minutes during that time period.  The TT1 location data confirmed that not only was ADAMS residing in New Castle, with occasional trips to Detroit, but also that he was residing at the East Lincoln apartment.  The TT1 location data placed ADAMS at that apartment on a nightly basis for months.

A surveillance camera was mounted near the East Lincoln apartment between May 2024 and August 2024.  The surveillance camera showed ADAMS at the East Lincoln apartment on a daily basis except for his occasional trips to Detroit.  The surveillance camera also showed Kiara JONES to be there on a regular basis as well as several other members of the DTO, including Christian FRIERSON and George WYATT.

On June 17, the surveillance camera captured George WYATT arriving at the East Lincoln apartment in his Hyundai Genesis. GPS/E911 location data for WYATT's TT6 cell phone, obtained via a judicial warrant, confirmed that WYATT had departed Detroit earlier that day and was just arriving in the New Castle area. After parking the vehicle, WYATT was observed moving toward the front of the Hyundai Genesis and opening the hood. Shortly thereafter, WYATT bent over and appeared to clutch something that was obtained from under the hood. WYATT was then observed tucking the unknown item under his shirt before closing the hood and entering the East Lincoln apartment.

After approximately 30 minutes inside, WYATT exited the East Lincoln apartment and could be seen holding a clear plastic baggie containing a white substance. Once again,

WYATT approached the front of the vehicle, opened the hood, and then reached for an area under the hood that was in close proximity to where he originally obtained the prior item from. As WYATT closed the hood, he was no longer in possession of the clear plastic baggie. Based on my training, current knowledge, and experience, I believe WYATT was using the engine compartment of the vehicle for the purpose of concealing yet-to-be-determined narcotics.

On July 7, 2024, ADAMS/TT1 made an outgoing call to Daniel RASNICK who was using number 724-698-3084. During the beginning of the call, ADAMS informed RASNICK that a narcotics customer needed a quantity of an unidentified narcotic, "My man wants 15, them ahh, blue thangs," in reference to the color of the pill. RASNICK informed ADAMS, "Ahh, I think the door locked, I think the room locked," identifying a room inside the East Lincoln apartment where the narcotics were being stored. ADAMS then responded, "I left you wit 22," and RASNICK replied, "Yeah I know, they on the table in your room," meaning ADAMS's bedroom at the East Lincoln apartment.  The surveillance camera captured RASNICK exiting the area of the East Lincoln apartment while talking on the phone during this call.

The next day, on July 8, RASNICK was arrested by local law enforcement in New Castle, following his unsuccessful attempt to flee from police (first in a vehicle and then on foot). Just prior to RASNICK's flight/arrest, the surveillance camera captured RASNICK exiting the East Lincoln apartment and entering a vehicle operated by Joseph LARRY. As RASNICK was attempting to run from the police, the surveillance camera captured him attempting to run back to the East Lincoln apartment while holding what

appeared to be a pistol.  As he continued to try to run from the police, he discarded a pistol as well as about 20 grams of cocaine that George WYATT had just supplied to him.

On July 8, shortly after RASNICK's arrest that day, WYATT/TT6 had a conversation with an unidentified male about the arrest of RASNICK, a/k/a "Caesar" and "Nephew."  WYATT stated, "Man listen, I give ma fuckin' Caesar zips right. Zips, zip of girl. Police pull him over, bruh he jumps out the car starts runnin' with the pistol and one of the zips, they got his ass, the pistol, and the zips."  It should be noted that "girl" is common code for cocaine and "zip" is common code for an ounce (i.e., 28 grams). During the same conversation, WYATT lamented about losing money as a result of recent law enforcement interventions.  WYATT stated, "Back to back to back to back man. Hit, hit, hit. You jus' can't count your money no more man."

Also on July 8, following RASNICK's arrest, Kiara JONES, using her 724-714-9961 number, called ADAMS.  JONES told ADAMS "We need to clear this house out" – expressing a desire to move the narcotics out of her apartment because of RASNICK's arrest that day.  ADAMS's replied, "Alright, Alright, I'm about to call Juicy and shit right now" – informing JONES that ADAMS was going to consult with FRIERSON (a/k/a "Juicy") about transferring the narcotics from JONES's apartment.

The next day, on July 9, Kiara JONES, using her x9961 number, called ADAMS/TT1 again to discuss the inventory of narcotics (i.e., "girl"/cocaine and "boy"/fentanyl) at her East Lincoln apartment after RASNICK's arrest the day before. During the conversation, Christian FRIERSON joined as well.  The conversation included the following exchange between Kiara JONES (a/k/a "KiKi"), ADAMS (a/k/a "Pops"),

46

and FRIERSON (a/k/a "Juicy") about the narcotics remaining in JONES's East Lincoln

apartment:

DA: What's up Kiki?

KJ: Hey Pops.

DA: What's goin' on?

KJ: Nothin'.

CF: Ay, Ay.

KJ: Yeah?

CF: Where that shit at Danny had?

KJ: You said what?

CF: Where is the shit at that Danny had?

KJ: There is some here and he got caught with some.

CF: It's some there and he got caught with some? What's there though?

KJ: It's only some 20s.

CF: Of uh what, of girl?

KJ: Yeah.

CF: No boy?

KJ: Uh uh.

CF: Aight. Uhm.

KJ: From what I seen, there was only like literally like maybe a couple 20s like three or

four 20s of that dog anyway. Like there wasn't shit f'real.

CF: Oh yeah. Ok.

KJ: That's just from what I can see. I don't be seein' everything.

CF: He had money on him or something?

KJ: I don't know.

### 9.      Interceptions during the Second Half of July 2024

Multiple calls intercepted on July 16 provided additional details on the inner workings of the DTO. For instance, during one call between Dedric HIGGINBOTHAM/TT5 and Tyrone DAVIS/x7554, DAVIS tallied the dollar amount owed to HIGGINBOTHAM for previous narcotics received, "Man I ain't got nothing homie. I'm talking about all together man, I'm a owe you 1,100 from the low low, and 1,200 from the girly. That's 23,000 dog!" HIGGINBOTHAM replied, "God damn. Alright man, let me call back," as DAVIS explained, "I'm keepin' it real, that's what I'm telling you. That's what I owe you dog."

On the same day, an intercepted call between HIGGINBOTHAM/TT5 and FRIERSON/TT2 exposed that FRIERSON's local drug trafficking crew needed an immediate re-supply. FRIERSON informed HIGGINBOTHAM, "man, we need you, shit man. For real, for real. It's, we gotta get this shit on a roll for real man." FRIERSON then expressed his concerns that rival drug dealers were in the process of taking over the DTO's customers due to a lack of product, "motherfucker trying to infiltrate type shit man." HIGGINBOTHAM confirmed, "somebody trying to take over this bitch." FRIERSON further articulated his worries about the rival drug crew, "they've been dropping the prices and all kind of shit," and the DTO's need for high-quality narcotics at a low price, "we got to get that fire on the floor man."

HIGGINBOTHAM then relayed, "I'm waiting on the Diablo man," which I believe is a reference to the Arizona supply that HIGGINBOTHAM and LETT traveled to secure.

FRIERSON responded, "hell yeah," and HIGGINBOTHAM told him, "it's coming though, for sure," meaning the bulk narcotics were in the process of being delivered to HIGGINBOTHAM. Toward the end of the call, FRIERSON informed HIGGINBOTHAM that his father, ADAMS, was on the way to Detroit with the intent of obtaining a re-supply of cocaine, "Pops said he's probably going to try to slide down there shit. Cause shit, we need that little momma for real." HIGGINBOTHAM responded, "well you need to tell him to slide on down right quick" – confirming that he had bulk cocaine to supply to ADAMS.

GPS/E911 location data on ADAMS/TT1 telephone revealed that, on July 17, ADAMS departed the WD/PA and arrived in Detroit. At approximately 10:27 AM, HIGGINBOTHAM, using number 313-721-2306, called ADAMS/TT1. ADAMS confirmed he had arrived in Detroit, "Ok, I was at the crib." HIGGINBOTHAM then informed ADAMS as to the status of the cocaine re-supply discussed between FRIERSON and HIGGINBOTHAM the day before, "I had it put up for y'all. They might have sold that bitch, but alright, but I'll see in one second."

At approximately 10:43 AM that day, HIGGINBOTHAM/TT5 called LETT/x9050 to inform him of the need to obtain narcotics, "I'm tryin to make something happen man." LETT responded, "uh we need to run into each other real quick," and HIGGINBOTHAM asked, "where you at, the crib?" LETT confirmed, "yea, I'm at the crib", and HIGGINBOTHAM confirmed, "I'll meet you there."

At approximately 11:36 AM that day, HIGGINBOTHAM called ADAMS to inform ADAMS that he was at ADAMS's 8183 Helen St address in the Detroit area, "Open the door." Around the same time, GPS/E911 location data for ADAMS's and HIGGINBOTHAM's phones revealed that they were in the vicinity of the 8183 Helen St

address. Then, at 11:46 AM, HIGGINBOTHAM's phone located on Sebastian Drive. I believe HIGGINBOTHAM met with ADAMS in person to discuss the details of the cocaine re-supply and then traveled to pick up the cocaine.

At approximately 12:16 PM that day, HIGGINBOTHAM called LETT and stated "I'm out here." GPS/E911 location data for HIGGINBOTHAM's phone confirmed he was located at LETT's residence. LETT was not there at that moment as he stated, "Ok, I went around the corner. I'll be right back." HIGGINBOTHAM then said, "I'ma shoot to Mr. C's, get a carwash." At approximately 12:36 PM, HIGGINBOTHAM's phone pinged back at LETT's residence. GPS/E911 location data for the phones belonging to HIGGINBOTHAM and LETT then showed their travel to an unknown location southwest of Detroit.

On July 21, HIGGINBOHAM/TT5 called Tyrone DAVIS/7554 and informed him, "I gonna be calling you man, I got sumptin' goin' boy, I'll call ya in a couple days!" DAVIS asked him to repeat what he said, and HIGGINBOTHAM told him, "I'll call ya in a couple days" – likely referring to the pending arrival of the re-supply of narcotics that was secured through the Arizona trip earlier in July.  DAVIS acknowledged, "yeah man," and told HIGGINBOTHAM, "damn, that's my bad U/I. That shit won't happen again" – referring to the mistake DAVIS made that resulted in him owing over $20,000 of drug trafficking proceeds to the DTO. HIGGINBOTHAM replied, "Man, you should never drop no ball like that bro!"

Subsequent intercepted calls revealed that HIGGINBOTHAM not only obtained a re-supply of fentanyl, but he was also in the process of determining its potency through reviews from drug users. On July 23, HIGGINBOTHAM/TT5 called DAVIS/x7554 to

discuss feedback from their drug customers on the recently obtained fentanyl. DAVIS informed HIGGINBOTHAM that DAVIS provided the fentanyl to drug users and he was receiving some negative feedback, "Man, shit, it ain't doing well. I'm giving it to the shooters now. The snorters saying man, shit, it ain't nothing special." DAVIS's comments are in reference to drug users who snort fentanyl and those who choose to intravenously use the narcotic.

Less than 30 seconds after the call with DAVIS ended, HIGGINBOTHAM/TT5 called LETT/x9050 requesting the same type of information, "What your man say?" LETT provided a specific rating as a result of the drug user review based on how they cut the fentanyl, "how we had it, they gave it, they like it actually. We gave it like seven, seven and a half." Although LETT seemed pleased with the result, HIGGINBOTHAM made it clear that he wanted higher potency, "that ain't what we looking for man," and "we need nitro glycerin," meaning HIGGINBOTHAM wanted the fentanyl to be stronger.

Less than 15 minutes later, HIGGINBOTHAM called LETT again and further emphasized his thoughts on the previous conversation, "that ain't the reading I want." HIGGINBOTHAM took it even further, indicating that he wanted to see drug users overdose on the product indicating it's high potency, "I want to see somebody go down bro." LETT agreed, "Yep."

The next day, on July 24, FRIERSON/TT2 communicated with HIGGINBOTHAM/TT5, who was keeping FRIERSON apprised of the status of the fentanyl, "I'ma have dat for you man. I'ma have dat for you soon man. I've been, I've been testin' em out. We getting' closer and closer baby!" HIGGINBOTHAM then stated, "They just sent a couple good ass samples, but I, I, I'm still wit, I want that, that bad mothafucka

bro!" Here HIGGINBOTHAM is referring to the fentanyl previously tested with drug users and expressing his desire for something even stronger. FRIERSON responded, "hell yeah, definitely."

HIGGINBOTHAM then informed FRIERSON, "They dilutin' that shit now. You can go down there, your, that shit gonna be diluted," referencing a lower quality narcotic that had been cut with too much additional powder. HIGGINBOTHAM continued, "but in a minute, I guarantee you, I'll be comin' to see you in a minute, so just, don't make no drastic, no more drastic moves dog!" I believe HIGGINBOTHAM was making sure that FRIERSON knew he would soon have highly potent fentanyl available for distribution. Additionally, I believe HIGGINBOTHAM was concerned that FRIERSON may have been considering alternate sources of supply and HIGGINBOTHAM wanted to re-affirm that he (HIGGINBOTHAM) would soon be in position to supply FRIERSON with the fentanyl he was looking for.

**E.     Seizure of Cell Phones 1-9 on August 1, 2024**

As noted above, on August 1, 2024, law enforcement officers served the federal arrest warrants that were issued following the return of the Indictment in this case. Christian FRIERSON, Devail ADAMS, Roy BROWN, Alexis DONNELL, Kiara JONES, and George WYATT were arrested on that date.  They were arrested in this district, in the Eastern District of Michigan, and in the District of South Carolina.

Just prior to August 1, ADAMS traveled to South Carolina for a vacation. On August 1, he was located and arrested at 2300 N. Ocean Blvd., Myrtle Beach, SC. Shortly before his arrest that day, ADAMS was observed using **Cell Phone 4**. ADAMS was taken into custody without incident and **Cell Phone 4** was seized from his person. It should be

noted that the seizure location of **Cell Phone 4** corresponded with GPS/E911 location data for, and contemporaneous interceptions over, TT1.

Also on August 1, law enforcement officers conducted surveillance in Roseville, Michigan, near the Wingate by Wyndham Hotel where FRIERSON was located. At approximately 9:00 AM, FRIERSON and a female exited the hotel at which point FRIERSON was taken into custody. Among the items seized from FRIERSON incident to his arrest were over $9,000 in cash, 1.1 grams of heroin, **Cell Phone 1, Cell Phone 2,** and **Cell Phone 3**.

Also on August 1, members of the FBI Oakland County (Michigan) Gang and Violent Crime Task Force conducted surveillance of an apartment building where Roy BROWN was believed to be residing. At approximately 8:30 AM, BROWN was observed in the rear parking lot entering a Cadillac XTS vehicle. The vehicle departed the area and was followed by law enforcement officers.

Law enforcement officers then conducted a vehicle stop and contained the vehicle without incident. BROWN was ordered from the vehicle and arrested on the outstanding warrant without incident. During the arrest, a handgun was removed from BROWN's right hip. Members of the task force then found two cell phones, **Cell Phone 5** and **Cell Phone 6**, in the front passenger compartment of the vehicle.

Also on August 1, law enforcement officers arrested DONNELL in Lawrence County in this district. The officers knocked and announced their presence at the front door of the residence known to be occupied by DONNELL. DONNELL came out and was taken into custody without incident.

DONNELL asked the officers if she could call her mother to arrange for her two

daughters to be taken into her mother's custody later that same morning. DONNELL stated that she had been asleep on the couch and that is where she left her cell phone – i.e., **Cell Phone 7**. At that time, DONNELL provided officers with the passcode for **Cell Phone 7** before attempting to place a phone call to her mother. DONNELL then informed the officers that her phone service was off and that she was unable to contact her mother with **Cell Phone 7**. DONNELL eventually made contact with her mother using an officer's phone and **Cell Phone 7** was seized as evidence.

Also on August 1, JONES and WYATT were arrested in Lawrence County in this district. **Cell Phone 8** was seized from JONES's person at the time of her arrest.  **Cell Phone 9** was likewise seized from WYATT's person at the time of his arrest.

_s/ Ryan J. Chrobak_
Ryan J. Chrobak
Special Agent, FBI

Sworn and subscribed before me, by telephone
pursuant to Fed.R.Crim.P. 4.1(b)(2)(A),
this 25th day of September 2024.


_____
HONORABLE CHRISTOPHER BROWN
UNITED STATES MAGISTRATE JUDGE